SNOOK & AUSTIN FURNITURE COMPANY *v.* STEINER & EMERY *et al*

1. Where there is nothing to indicate an intention to limit the possession to buildings, and city premises are described by street numbers, the lessee takes an interest in the yard, garden, subjacent land, and appurtenances, and retains the right to the possession of such land after the buildings thereon have been destroyed, being in turn bound to pay rent for the balance of the term.  Civil Code, § 3135.
2. Where in a lease of city property neither land nor an interest in land is mentioned, but the property is described as all those premises Nos. 2–10 Peachtree street, including the second and third stories over the same, with the building in the rear, and including the second story over the packing-house, excepting therefrom the offices in the rear thereof, the lease is of buildings, and no estate in the land is created.
3. While in such a lease no estate in land is created, yet the grant carries with it the right to have the buildings supported, as a necessary incident. Such right is defeasible, and ceases when they are totally destroyed and it is no longer needed to make possible the enjoyment of the thing leased.
4. By agreement the term may be continued after the destruction of the building, even though the payment of rent is to cease.

5. Even in the lease of an interest in land the parties may, expressly or by implication, provide for its termination upon the happening of a contingency, or a condition subsequent.

6. Under a lease contract which provides that "should the leased premises be destroyed by fire" the lessors "are to rebuild the same with all reasonable dispatch, at their option, and that from the time of such fire until the rebuilding has been completed the rent shall abate for such time," if, after the buildings are totally destroyed, the lessor promptly notifies the lessee that he elects to rebuild and thereupon proceeds with all ordinary diligence to erect a structure substantially like that destroyed, the relation of lessor and lessee is suspended until the new building is ready for occupancy, when the rights and obligations of both under the lease are renewed.

7. Ordinarily the payment of rent and the right of possession are reciprocal; and if under such a contract the lessor notifies the lessee that he elects not to rebuild, or that he will build a different kind of structure, the tenant is relieved from the obligation to pay rent, and is no longer entitled to possession of the vacant premises.

Argued February 21, — Decided March 13, 1903.

Petition for injunction.    Before Judge Lumpkin.    Fulton superior court.    February 2, 1903.

On January 27, 1892, Mrs. Flynn leased to Steiner and Emery, for fifteen years from March 1, 1892, unless sooner terminated in accordance with the provisions of this indenture, "that tract or parcel of land situated in city lots 12 and 13 in the city of Atlanta, . . bounded . . , and being the property where the National Hotel is situated, with and subject to all the rights, members, servitudes, and easements thereunto appertaining or belonging." The lessees were granted the right to erect such buildings as they might see fit, to add to and improve those then existing, to take down and remove any building other than the hotel building, to make excavations and do such other work as was necessary to build new structures or improve those existing, and to sublet all or any part of the premises demised. It was covenanted that in case the hotel building should be destroyed by fire, Mrs. Flynn should rebuild it with all reasonable dispatch, a proportionate part of the rent to abate pending such rebuilding. The lessees were to pay $625 per month, to keep the property insured in the lessor's name for $28,000, to pay all taxes, assessments, and governmental charges, to return the premises, at the end of the lease, in as good repair as at the date of the lease, free from all charges, liens, or incumbrances, to protect the lessor from all city ordinances in reference to the property, and to make at their own expense all repairs they desired. All

buildings, improvements, additions, and betterments were to become the property of the lessor at the end of the lease. Failure to pay rent for thirty days would give her the right to re-enter and terminate the lease.

On August 4, 1894, Steiner & Emery executed to Rhodes, Snook, and Haverty a lease, for five years ending July 31, 1899, unless sooner terminated, of "all those certain premises in the city of Atlanta known as numbers 2, 4, 6, 8, and 10 Peachtree street, including the second and third stories over the same, and including the kitchen in the rear of said premises, excepting therefrom the offices at the rear thereof on Wall street, ... with and subject to all the rights, members, servitudes, and easements thereunto appertaining or belonging." The other terms were practically identical with those in a renewal lease (hereafter set forth) to the lessees' successor (the plaintiff). Rhodes, Snook & Haverty became incorporated; and on April 1, 1895, Steiner & Emery leased to the corporation the second floor of the building erected for the Nashville Packing Company, for the unexpired term of the lease. The name of the corporation was afterward changed to that of the plaintiff. On December 31, 1898, Steiner & Emery executed to the plaintiff a lease of the premises a description of which has been given, "to have and to hold the above-described premises to the second parties, their executors, successors, and assigns, for and during the full term of five years" from July 31, 1899, "unless sooner terminated as hereinafter provided." It was agreed, that the alley adjoining the Steiner & Emery block in the rear of said leased premises should be kept 15 feet wide, and the south side of another alley leading from said 15-foot alley should be on a line with the south corner of the old wall then standing on the premises; that the lessees might sublet, without being released from any obligation hereunder or subjecting the lessors to any liability on account thereof; that the rental should be $762.50 monthly; that the lessees should return the premises at the end of the lease in as good repair as when leased, usual wear and tear excepted, free from all liens, incumbrances, and charges, should keep the premises in repair during the lease (except the roof), should do nothing that would injure or weaken the building, and should hold the lessors harmless from all damages arising from the use or occupation of the building, except damages resulting from defective roof, not

caused .by the lessee's; that all permanent improvements should become the property of the lessors at the end of the lease, "and should the leased premises be destroyed by fire during this lease, the first parties are to rebuild the same with all reasonable dispatch, at their option, and that from the time of such fire until the the rebuilding has been completed the rent shall abate for such time, or, if only a part thereof should be destroyed, such rent shall abate ratably." The last clause gave the lessors, on failure to pay any installment of rent, the right to re-enter and terminate the lease at their option, after three days notice, and provided that the lessees should have no right to make claim for improvements or betterments, or to claim any other benefit under the lease. In an affidavit by Emery it is stated that when this last lease was submitted to the lessors for signature, they objected to the provision, "should the leased premises be destroyed by fire during this lease, the first parties are to rebuild the same with all reasonable dispatch," and declined to execute the same until the words "at their option" were placed in the paper. Snook and Austin made affidavit that Steiner and Emery both stated that they desired those words inserted, that they might not be forced to rebuild in the event the then building was destroyed by fire during the latter period of the lease to plaintiff; and that, as their own lease would expire in about three years longer, it might not pay them to rebuild in the event the hotel building should be destroyed during the latter part of the plaintiff's lease. Nothing was said in reference to erecting a different building from the one the plaintiff had leased and was then occupying. The sole matter discussed was whether it would repay the defendants to put upon the property another building if a fire should occur toward the end of the plaintiff's lease.

In evidence also appeared a lease from Meegan, administrator of Mrs. Flynn, to Steiner and Emery, reciting that they are "the holders of a certain lease and estate for years" in the property described, created by the indenture of January 27, 1892, "which said leasehold estate and term of years" runs for fifteen years from March 1, 1892, to March 1, 1897; that the will of Mrs. Flynn authorizes the creation of an additional leasehold estate for ten years more; that a viaduct has been built across the National Hotel part of the property, and will render it and other buildings

on the premises less valuable for renting' purposes; that the estate has no money to make necessary improvements, and that the lessees are willing to enter into a contract for a new leasehold estate terminating March 1, 1917, paying therefor $10,000 cash and $7,500 annually for the new leasehold estate. The agreement then conveys, for the additional term of ten years, the premises described in the original lease from Mrs. Flynn. Steiner & Emery are allowed to erect new buildings or improve the old ones, and required to maintain $28,000 insurance on the building which should at any time stand on the National Hotel site; in case of fire the insurance money to be used in replacing the building. If the building on the National Hotel site should be damaged or destroyed by fire, it shall be replaced with all reasonable dispatch, and during the period of repairing or rebuilding the rent shall abate in a stated way. The buildings other than the National Hotel are to be insured at $15,000; and if Steiner & Emery decline to restore the building on the National Hotel site, or any other buildings that may be destroyed, the administrator shall retain the insurance money, and in that event the rent is not to abate. Failure to pay rent for thirty days shall, at the lessor's option, terminate the lease.

A fire occurred on December 9, 1902, by which the building occupied by the plaintiff was destroyed. Meegan, as administrator, on January 7, 1903, made an agreement with Steiner & Emery, reciting the destruction of the building and the collection of the insurance money, of which $16,000 was to be assigned to Steiner & Emery; and in consideration thereof, and of their release of the administrator's obligation to rebuild upon the premises as provided, it was provided that the hotel building or similar structure need not be rebuilt, but Steiner & Emery should expend the $16,000 insurance money, and not less than $12,000 additional, in building permanent improvements on the leased premises, of such design and character as they should think proper.

Steiner & Emery entered and began to tear down walls, clean brick, and remove debris. On January 21, 1903, the plaintiff wrote to the defendants: "We note the newspaper reports that you are about to erect a six-story building on the property leased by us; and we would thank you to advise promptly as to whether there is any truth in this report, as our rights in the matter make the subject of great interest to us." The defendants answered: "Under

the option contained in the contract between us, we elect not to rebuild the leased premises, which, as you know, have been destroyed by fire. The improvements which we contemplate putting on these premises will be of a totally different character, and will in no wise be a rebuilding of the premises which you leased." On the next day the plaintiff wrote that it had no objection to the erection of a better building, provided the new contained as much floor space "as the building leased to us, and be as well adapted to our use, and provided it will take no longer to erect than it would to rebuild the leased premises." It asked for an opportunity to examine the plans and specifications. The defendants declined to submit the plans and specifications, or to further discuss with the plaintiff the character of the building proposed to be erected, claiming that the "relation of landlord and tenant no longer exists between us, as we have exercised the option which terminated it." Thereupon the plaintiff filed a petition reciting that the leased premises were peculiarly adapted for its business, which was located at the best stand in the city; that it was impossible to procure quarters anything like so desirable at other points in the city; that the good will of the company was a valuable asset; that the damages it would sustain by reason of not being allowed to keep the premises; were incapable of exact computation, and therefore irreparable; that its lease contract in other respects was most valuable, inasmuch as it sublet portions of the building and thereby made a net profit, besides receiving the rent of 25,000 square feet free. It prayed that Steiner & Emery be restrained from erecting on the premises other than such buildings and improvements as will be substantially in size and arrangement the same as the buildings burned, and from leasing to others any part of the buildings to be erected, in a way to interfere with the rights of petitioner under its lease. There was no allegation of insolvency. The judge refused the injunction, and the plaintiff excepted.

*John L. Hopkins & Sons* and *Rosser & Brandon*, for plaintiff.
*King & Spalding*, for defendants.

LAMAR, J. Ordinarily it is the lessor who insists that the term continues notwithstanding the destruction of the building. Here the usual positions are reversed. The lessors entered after the fire, began removing the debris, claimed that the contract was at an end, that the furniture company was not indebted for future rent,

and that the lessors were entitled to the possession of the premises and to build thereon a structure entirely different from that destroyed. The tenant sought to enjoin the building of a different character of structure. The defendants are solvent, and the case might possibly have been disposed of on the point as to whether the damages were irreparable, and whether a court of equity could enjoin a solvent defendant when the trespass was complete. But, using the word "lease" in a popular rather than in a strictly technical sense, we shall follow the line of argument of counsel for both parties, who fully discussed the questions that must finally control.

1. Where city property is described by street number and there is a lot or garden attached, or where a farm with buildings thereon, or a city building described by metes and bounds, is leased, or it is evident from the language used in the contract of rental that the tenant takes an interest or an estate for years in land, the destruction of the building does not destroy the lessee's interest in the land. After the structure is destroyed the tenant is still entitled to the possession of the land for the balance of the term. The common law and our Civil Code, § 3135, unlike the civil law, make no apportionment of the rent in consequence of a destruction of part of the leased property. But where the leased premises constitute one or more apartments, or where the language shows that the subject-matter of a lease is a building on land, without any conveyance of an interest in land itself, the destruction of the building terminates the tenant's interest in the land supporting the building.

2. The issue between the parties is clear-cut. It is admitted by the plaintiff, it only the buildings were leased and no interest or estate in land was created, that the destruction of the premises would terminate the plaintiff's right to possession; but it is insisted that the instrument of conveyance was called an "indenture;" that the property leased is referred to as "premises;" that the premises were leased "with and subject to servitudes and easements;" that these phrases and the technical words, "grant," "appurtenances," "demise," and "to farm let," all clearly show that land, or an estate in land, and not a house on land, was conveyed.

No particular form is essential to the validity of a deed, and technical words are not necessary to create an estate in land. Civil Code, § 3602. On the other hand such an estate will not be

created by the mere use of technical terms, if from the instrument construed as a whole it is apparent that the parties did not so intend. Technical words are great aids in determining the meaning of instruments, but the use of such terms will not prevail over the real intention of the grantor when clearly ascertained from the four corners of the paper. Civil Code, §§ 3673, 3675 (2). The property was described as "all those certain premises in Atlanta, known as Nos. 2 – 10 Peachtree street, including the second and third stories over the same, and including the kitchen in the rear of said premises, and including the second floor over the building recently erected for the Nashville Packing Company, excepting therefrom the offices at the rear thereof [probably kitchen] on Wall street, and being in land lot seventy-seven, said county, with and subject to the rights, members, servitudes, and easements thereunto appertaining." It is important, if possible, to define the word "premises." It has varied meanings; it is a word frequently used in conveyances, and, unless there is something to qualify the meaning, generally refers to real estate. In a contract to sell the "premises Nos. 2 – 10 Peachtree street," it would include the land on which the buildings were located. McMillan *v.* Solomon, 42 Ala. 356; cf. *White* v. *Molyneux*, 2 *Ga.* 124. On the other hand, if an insurance company were to insure such premises, it would only mean the buildings thereon. The word rarely includes personal property, and yet in a policy on a ship it was held to refer to the vessel. 1 May on Insurance, § 243. In the lease contract here the word "premises" simply referred to whatever was leased, without defining the property or estate. It shed no light on the question as to whether an interest in land was created. Compare Zinc Co. *v.* Franklinite Co., 13 N. J. Eq. 331. We get little assistance from the word "premises" with its variable meaning, and must examine the other descriptive terms to determine what was leased. There is no mention of land, nor is the property described by metes and bounds. The indenture refers to the "premises, . . . including the second and third stories over the same," which was an unusual form of description if land was intended to be conveyed. It may not be necessary, but it is quite common to convey "land with the buildings thereon," but almost unheard of to describe the parts of a building, or the separate stories thereof, when land is intended to be conveyed. Where no reference is made to land, where the

words "house," "dwelling," or "hotel" were not used, but only the parts of the building were specified, where the second and third stories were expressly mentioned, it goes far to indicate that the parties were contracting with reference to a building, and not creating an estate in land. This must be true as to the packing-house ; for as to it the first story was excluded, and only the second story rented. So, too, as to the kitchen. It appears from the description in the Haverty lease that the offices on Wall street were in the rear of the kitchen. Consequently no land under the packing-house or kitchen was conveyed, but only a right of support; and this is not an estate. Womack v. McQuarry, 28 Ind. 103. It is true that the word "premises" is used in other parts of the instrument where it could refer either to the land or to the buildings, or to both; as, for example, "permanent improvements placed on the premises shall become the property of the lessor." But as here used it might refer to improvements *in* the building. The provision that the tenant was to "keep the premises in *repair*," and the phrase, "should the leased premises be *destroyed* by fire," did not relate to land, but to the structure.

We have carefully considered the argument based on the fact that reference was made in the lease contract to "the old wall now standing on said premises." This language does indicate that "premises" referred to land, but we do not think it sufficient to counterbalance the argument based on the very unusual, peculiar, and controlling language of the descriptive paragraph of the lease, where parts of the main building and other buildings are specifically described as the property that was leased. Nor does the allusion to "land lot seventy-seven (77) of the fourteenth (14) district of said county" affect this construction any more than the use of the phrase, "in the city of Atlanta." It was but an effort to specifically describe where the premises were located. So, too, as to the argument based on the fact that in other instruments between Steiner & Emery and their lessors the property was referred to as a leasehold or an interest in land ; for even if definitions in contracts between them and other parties would shed light which could be used in determining the meaning of phrases in a contract with the plaintiff, we think that there was the material difference that in those instruments land was expressly named and the tract described by metes and bounds. The conclusion that the lease here was of

buildings and not of an interest in land is somewhat supported by what this court said in *Fleming* v. *King,* 100 *Ga.* 454, where the building was totally destroyed by fire, that "the evidence strongly indicates that the tenants only rented the *storehouse* from the landlord, and, in that case, when it was burned their whole interest in the property was gone, and the landlord had the right to re-enter, not only for the purpose of enclosing the cellar, pulling down the walls, and cleaning the brick, but for the purpose of rebuilding, without being guilty of an eviction." In *Alexander* v. *Dorsey,* 12 *Ga.* 12, and *Pope* v. *Garrard,* 39 *Ga.* 471, the destruction of apartments was held to entitle the landlord to re-enter, even though it was decided that under the Civil Code, § 3531, he could still recover the rent. See also Ainsworth *v.* Ritt, 38 Cal. 89. As to the general rule, in other jurisdictions, that the destruction of a building containing the leased apartments abates the rent, see McMillan *v.* Solomon, 42 Ala. 356, and cit., s. c. 94 Am. Dec. 654.

3, 4. The original lease from Mrs. Flynn undoubtedly described and conveyed land eo nomine. Its provisions as to returning the property free from incumbrances by lien, or for water, gas, or other charges, were copied into the lease of the premises Nos. 2 – 10 Peachtree street. Putting in such provisions as a result of mere mechanical copying (Civil Code, § 3672, par. 6), or out of abundant caution, or because it was supposed to be necessary, would not enlarge a lease of the building into a lease of land. So, too, the fact that the property was leased "with and subject to easements and servitudes" is not of controlling force in the construction to be given. For an easement of ingress and egress over an alley may pass as an appurtenance in a lease of a building or of an apartment in a building. Doyle *v.* Lord, 64 N. Y. 432; Seidel *v.* Blouser, 77 Mo. App. 172; Patterson *v.* Grant, 140 Ill. 531. Though no estate in land was created, the lease of the building alone undoubtedly implied that the lessee had such an interest in the land as was necessary to support the leased premises. For in a lease of an apartment or of a house the grant necessarily carries with it, as an incident, whatever is necessary to the enjoyment of the leased premises; but as soon as the incident is no longer required to make possible the enjoyment of the thing conveyed, the interest of the tenant in the incident terminates. Such right in the land is defeasible. A lease of a building may include lease of

a particular right in the land, but not of the land itself, and when the building is destroyed the particular right of the lessee is vested in the lessor. Austin *v.* Field, 7 Abb. Pr. (N. S.) 29; Graves *v.* Berdan, 29 Barb. 104. "In such cases no interest in the land passes; or rather, after the destruction of the building and apartments demised, no interest in the land remains in the tenant." Compare Stockwell *v.* Hunter, 11 Met. 457; Buerger *v.* Boyd, 25 Ark. 441. Where such is the intent of the parties, the term may continue after the building has been destroyed, even though no rent is to be paid until its restoration, as where there is a partial destruction of the premises, or the tenant is himself bound to repair or to rebuild but is relieved from paying rent until the work has been finished. Smith *v.* McLean, 22 Ill. App. 451, s. c. 123 Ill. 210.

5-7. The parties may provide for a suspension of the relation of landlord and tenant between the time of the destruction of the building and its reconstruction. In such a case the landlord is bound promptly to rebuild, and as soon as the new structure is complete the tenant's liability to pay rent is renewed. But if the landlord, instead of binding himself to rebuild, merely reserves the option so to do, and provides that rent abates until the structure is rebuilt, and when thereupon the landlord notifies the tenant that he will not rebuild, or that he will build an entirely different character of structure, the termination of the tenant's incidental right of support in the land is permanent. A lease contract, like all others, must be construed according to the intention of the parties, and with reference to the subject-matter. *Alexander* v. *Dorsey,* 12 *Ga.* 14. And if it appears that the parties intended that possession was to be surrendered when the liability for rent ceased, the courts will give effect to such intention, even though an interest in land and an estate for years had been expressly created. In endeavoring to determine what was the intention of these parties let us put ourselves as nearly as possible in the position they occupied on December 31, 1898. The property was very valuable; it was renting for something like $10,000 per year; the landlords themselves were tenants with a term which expired in 1907, paying rent to Mrs. Flynn at the rate of $625 per month, and being also bound for taxes thereon; the former contract with Rhodes, Snook & Haverty had required Steiner & Emery to rebuild; when the new lease was presented they expressly refused to enter into an abso-

lute contract to rebuild, but reserved *the option* so to do, agreeing that the rent should cease until the building was reconstructed. A fire might have occurred shortly after the lease; the policies might have lapsed; the companies might have refused to pay; litigation to collect the insurance money might have resulted; or it might have been considered that the then form of structure was undesirable. They therefore reserved the right not to rebuild. Can it be supposed that, with property so valuable, they would have stipulated that during the rest of the term the furniture company should be allowed to remain in possession without payment of rent? Is it not evident that both parties understood, if Steiner & Emery decided not to rebuild and thereby lost the right to collect rent, that the relation of landlord and tenant should cease? It would have been most unusual to permit the vacant lot to be occupied free of charge, although at the same time Steiner & Emery were under obligations to pay rent to Mrs. Flynn, besides paying taxes on the property. An estate for years may be made to terminate upon a contingency or a condition subsequent. Civil Code, §§ 3112, 3136, 3137. In effect the parties provided that the duty to pay rent and the right to occupy the land should be correlative. The furniture company had only leased the stores, the second and third stories, the kitchen, and the second story of the packing-house. When those designated subject-matters of lease were destroyed, and the landlords gave notice that they would not rebuild, the term ceased, whether it had been an interest in land, or in buildings on land, or of a second story over the packing-house, or of all combined. In Buschman *v.* Wilson, 29 Md. 553, certain real estate with planing-mill and other buildings were leased for six years, it being stipulated that if the whole property was burned down the rent would cease; the buildings were destroyed; the tenants remained in possession and refused to allow the landlord to re-enter. An interest in land seems to have been conveyed; but the court held, that, having regard for the manifest intention of the parties, and the fact that the tenant and his cotenant were availing themselves of the exempting provision, they were not entitled to retain possession. "The clause with reference to the cessation of rent implies an obligation on the part of the tenants to surrender the premises upon the occurrence of the event that released them from the further payment of rent. Any other construction would work gross injustice,

and contravene the plain purpose and design of the parties." Citing Gates v. Green, 4 Paige, 355. See also Ainsworth v. Ritt, 38 Cal. 89 ; Miller v. Miller, 15 Pick. 57, 61, 63.

Complete surrender of the premises is a condition precedent to the tenant's release from liability for rent under statutes containing provisions substantially similar to the contract here. Roach v. Peterson, 47 Minn. 291 ; Gay v. Davey, 47 Ohio St. 396 ; Smith v. Karr, 108 N. Y. 31. In Tatum v. Thompson, 86 Cal. 206, the premises were not destroyed but damaged, and the tenant's right to retain possession without payment of rent was based on the landlord's breach of duty.

Whether the contract created only a usufruct or an interest in land, in view of the provision that the rent was to cease until the building was reconstructed, the notification by Steiner & Emery that they would rebuild an entirely different form of structure, and the evident intention of the parties that the obligation to pay and the right to possession should be correlative, the chancellor was right in refusing the injunction; and the judgment is

*Affirmed. By five Justices.*